Guzman-Cordoba, you may proceed. Yes, thank you. May it please the court, counsel, my name is Daniel Hellis, I represent Ms. Guzman-Cordoba. She went to trial on a coercion defense and the difficulty that she immediately faced was the defense was gutted when the district court ruled that the death of my client's father and a drug dealer named Pac-Man were irrelevant. That then affected the jury instruction, which was erroneously given because the jurors were not instructed to consider the potential death or serious injury to my client's father, her child, her babysitter and how those things motivated her actions. And there is still one additional error in that the district court did not have the jury make a determination for forfeiture of the almost $10,000 that ordered my client to forfeit. So I'll begin with the exclusion of the evidence due to the judge's erroneous ruling on relevance. The government objected to relevance, but it then explained in the colloquy of the district court that it was not a relevant objection, it was speculation. So there was no record that the government ever made to show that the evidence was irrelevant. And of course, relevance is a very low bar and my client was even tangential. This was the heart of her coercion defense. And there was evidence from a proffer by a government witness, Mr. Salgado, that explained that Mr. Noble, who was a co-conspirator in the case, was responsible for the death of the drug dealer Pac-Man. And there was a strong inference. This is then a drug-related activity. And it goes to- Mr. Hillis, this is Judge St. Eve. Sorry to interrupt you. The, was there any evidence that your client knew of this drug dealer Pac-Man's death at the time or believed that it came from the drug trafficking organization? I didn't see anything in the record that would link her knowledge to that. Well, Your Honor, the problem was that the district court didn't allow the record to be developed on that through an author of proof. She made a determination immediately There was no request, though, to make an author of proof, was there? There was not. However, it wasn't something that, there was much done by the district court to allow the record to be developed on that. So I think that district courts are mindful of these things and often allow parties or suggest parties to make an author of proof. But here there was an erroneous ruling about relevance, which is a low bar anyway. So, well, Your Honor- But how can we review for relevance? Because I think you would agree, Mr. Hillis, in order for the death of Pac-Man to be relevant to a coercion defense as to your client, that Ms. Guzman-Cordova would have had to have known of his death and had to have known or believed that it was carried out by the same drug organization that she was working for. And I don't see anything in the record that would support that argument. Well, I'm not certain that her firsthand knowledge was required, Your Honor, it would still be relevant. It might be then a matter of admissibility. But I think those are two different things that we need to keep in mind. Well, how could her relevance not be, how could her knowledge not be relevant? If the coercion, you're seeking to admit this for the coercion defense. And for coercion, she would have to have an immediate fear of death or bodily injury if she didn't carry out what the drug organization wanted her to. So she, I don't see how it would be relevant if she didn't at least believe that Pac, know of Pac-Man's death and believe that it was carried out by the drug organization. Right, all I can say on that, Your Honor, is that, well, I agree with you that it would be a stronger claim if she had known. Really the record developed on the subject, but I think that there's an easy explanation for that. And it should not prevent my client from having the ability to make a powerful coercion defense because the government, of course, had steered the district court right out of the gates to the idea that harm to third parties was not a relevant consideration. So that very much affected the ability to make the record and how the case transpired. But if I may steer at least over to the death of my client's father, that is something that she knew about, and she was prevented from presenting that evidence. So even if we were to say that the exclusion of the evidence concerning Pac-Man was irrelevant and that wasn't an abuse of discretion, I don't think that we can make that same conclusion as to the death of my client's father. She did know about that. Her father was killed after she was already in jail for months on this case. So again, going to coercion, it would have to be something she knew or believed at the time that she was engaging in the drug activity. So how would it be relevant that he was killed after she'd already been placed in jail in this case? Sure. Well, it's proof of the violence and the murderous efforts of the organization that she believed were a constant threat. So it is surely relevant to show the reasonableness of her belief through the fatal consequences that befell her father, Your Honor. That's a pretty linear explanation in my view. Mr. Hillis, this is Judge Brennan. How would that not be a tremendously broad exception that would allow a coercion defense in nearly all of these types of cases? What is the limiting principle? Well, relevance first, prejudicial effects second, and then the text of the defense under the Pet and Jury Instruction 6.08, it does not have anything to suggest that this is exceeding the bounds of the instruction, Your Honor. So in terms of a limiting principle, if the jury instruction should be given, and in all aspects, that's not contested. There was a coercion defense my client was entitled to. We are now then whether, I guess, the jury would consider that it be reasonable that she would be under this duress. But that's a jury question at that point. Mr. Hillis- It is not something- The jury instruction isn't what sets the limits. It's the law and the relevance and the federal rules that set the limits. She was within the bounds of all those things, though, Your Honor. I think, again, the relevance is through the factual connections that I just laid out a moment ago. And now we are looking at the text and it falls within a reasonable fear of harm to her potential harm, death or serious injury to third parties. And so it is therefore both relevant and it falls within the text of the instruction. So in that regard, we believe that there was error. Now, if there are no further questions on that, I will move to the jury determination about the forfeiture because that is something that, again, there was a very definite error in our view here because Rule 32.2B5A requires the jury to make the determination about forfeiture. And this, again, shows that the rules were not being especially attended to. So there's a lapse about the pattern jury instruction 6.08. And then there's a disregard for Rule 32.2B5A. The jury was discharged without making any finding about forfeiture. And the government puts together the evidence that it offered at trial, trying to show that this is now something that we shouldn't be concerned about. Mr. Hillis, do you agree that that argument, I'm sorry to interrupt. I know it's harder when you're on the phone. Do you agree that there was no objection by your client to the failure to raise the rule and to have the jury make that determination on forfeiture? Oh, I agree completely, Your Honor, but now we are in the realm- So you agree it's been forfeited and then the question turns to whether or not it affected her substantial rights? Well, I don't exactly agree with that, Your Honor, because this is the type of error that my client didn't have advanced notice of. So in terms of the standard review, Thompson, Kappas, those cases, by its release context, as you know, but they say that when you don't have advanced notice of something, you don't have an obligation to object it and then triggers the same standard of review. So we think it is de novo, and it's different from those other cases. How do you get around Fisher? Even at the point where- How do you get around a recent decision in Fisher where this is essentially exactly what happened, that there was no objection to the rule, to the forfeiture, and therefore it was forfeited and it was just a substantial rights question? Well, I'd rather not get around Fisher. I'd rather go through Fisher and try to argue that Fisher was incorrectly decided by way of standard review, because I believe it was. If somebody didn't have something, to make objection after the fact is a Barrett-type situation where the party isn't required to take exception under the federal rules, Your Honor. So I think that Fisher used the wrong standard of review, but if we are under plain error, we can demonstrate a basis for relief under plain error, because there's, of course, an error that is plain because the rule requires retention of the jury to make this determination. That didn't happen. It affected substantial rights. My client was entitled to have a jury make this determination. It also affected her property rights. So it's not just procedural. There is a substantive hook to this. And then finally, the impact on the integrity of judicial proceedings. Courts and the public expect that the rules will be followed. This is a rule that is very apparent. It isn't something that people should miss. And yet I will say that under Fisher, Cherry, and all these cases, this is consistently missed. And then it sort of gets swept away, but we can't do that easily here. Because in Fisher, Cherry, other cases, Lyon, where the proceeds or the thing that's in dispute, you know, such as a handgun, that's contraband, and somebody isn't allowed to have that. So it cannot be returned to the person under the forfeiture rules. Those cases are different. But this is cash, and there is an explanation for a legitimate source of income. So this is different from all of those cases. Even if those can come out the way that they did, this case can't. And I would like to circle back to one thing before I give up the floor. As to the second issue that I raised, I would ask the court to pay specific attention to the Herrera case, because that was a plain air reversal by the 11th Circuit. I think it was back when the 11th and the 5th were combined. But nevertheless, it is still good authority. And I would ask the court to note that. And again, we think relevance is a low bar, so we've overcome that. With that, I'll reserve any time that I have left. Thank you. Actually, your time has expired, Mr. Hillis, but thank you very much. We'll move now to Mr. Zerv. Good morning, and may it please the court. Paul Zerv for the defendant Joel Alvarado-Santiago. Just as with Guzman's part of this trial, the district court committed numerous substantial, significant errors in Mr. Alvarado's portion of the case that require reversal here. I want to start with Mr. Alvarado's post-arrest statement. The district court abused its discretion in not requiring the government to complete its presentation of Alvarado's post-arrest statement and by not even allowing Alvarado to introduce those redacted portions in his own case. The government charged Alvarado with one count, with money laundering. And to prove money laundering, the government needed to prove that Alvarado knew, not just guessed, but actually knew that the money that was coming to his store was coming from some unlawful source. But that's not what he told the law enforcement officers at the time of his arrest. What he told the law enforcement officers was pure speculation, pure guesswork. That he thought the guys who were bringing money to him were drug dealers based exclusively on their appearance. The fact that they were wearing lots of gold, were wearing earrings, and that they were Mexican. He thought that because they were Hispanics, that Hispanics worked drugs and were in gangs, according to his own words. And so that was what he was basing his speculation on. It was rank speculation. It was not any evidence of knowledge. The government fundamentally...  and had the opportunity to clarify all these statements to the jury. Why doesn't that make any error to the extent there was one harmless? Because he did not have the opportunity to clarify it to the jury, Your Honor. He was barred from clarifying these points to the jury. Prior to him testifying, this is at pages 1170 through 1175 of the transcript, just before Alvarado took the stand, he again raised this 106 point. Again said, hey, there's this pending motion to allow me to introduce the remaining portions of my statement. The judge said at that time, I have not looked at the law. Why don't you go forward with your presentation, your testimony, and see if you can get it in some other way. This happened just before Alvarado took the stand. Then, so he didn't have a ruling saying that he was allowed to introduce these explanations. But that's separate and apart from giving his own testimony, explaining it. In fact, in some ways, it's better to be able to speak to it yourself rather than have a statement of it admitted. So that sounds to me like an invitation from the judge to do just that and clarify anything that he felt like he needed to from his prior statement. Right, and that, again, he was, based on the record, he was barred from doing that. If you go to page 1189 of the transcript, there was one point during his testimony where he actually wanted to start talking about what he actually told law enforcement. Government objected to that portion, and the district judge sustained that objection. He went out and out. Mr. Sir, I'm sympathetic to this argument you've offered under Rule 106. It strikes me that there's a problem here. But I think Judge St. Eve is onto something here with the harmless error point, meaning if admitting only the redacted interview could misconstrue to the jury that Alvarado Santiago, what he's saying about his understanding of where the money came from. But isn't there still a harmless error problem? How do you address that? No, it's not a harmless error point problem for a few reasons. Reason one is, I have to dig in my heels here. He was not allowed to say the things that he wanted to say about what he actually told law enforcement. And problem number two, there's a difference between him being allowed to say what was actually going on in his store on the one hand. And I'm not clear from the record that he was even able to say that. But more importantly, that's distinct from number two, that to correct what he actually told law enforcement. If he had had the opportunity to actually tell the jury what he really told law enforcement, that would call into question the government's proof. And that in and of itself is a significant argument point from which he could argue that the jury can't trust the government's proof here. If you were actually able to tell the jury, look, what I really told law enforcement was that I just was guessing about what the money was coming from based on the appearance of these people, then he would have been able to argue to the jury that you can't trust what the government had been proving because the government said something else in its case in chief. That's the part that he was barred from being allowed to say to the jury. And again, it was a motion that was pending when he was required to take the stand and a motion that was decided against him on four or three grounds. After he got off the stand, he was out and out prohibited from showing the jury these other pieces of his statement. The other way he could have done this, Your Honor, was to recall special agents. He wasn't allowed to do that. He wasn't allowed to show the jury that the complete version of his statement had him speculating about the nature of his statement instead of, or I'm sorry, speculating about the nature of the drugs or the money as opposed to telling law enforcement officers that he knew where the money was coming from. The other part on harmless error, Your Honor, is that outside of this statement, the government's evidence is razor thin. And so if we get to the point that we're actually weighing the evidence, the government doesn't have a leg to stand on. It really comes down to the testimony of the cooperating witness, Salgado. Salgado is the way that the government's able to show that Alvarado was the cartero who was using the phone, something that he consistently denied. And so really at this point, we're questioning whether this court can affirm the judgment, affirm the jury's verdict based entirely on the say-so of one cooperating witness. Maybe a new jury would come to that conclusion, but that's a pure jury question. There's no way under a harmless error review where the default is to reverse the case that this case can stand, this case can be affirmed. I'm trying to remember if there's one other point. Point. Really, it comes down to that. Go ahead. Dovetails, I think overlaps with the deliberate avoidance instruction argument because there was some evidence to support that, which supports the government's case on this particular issue to improve a source of this money. And I know you've raised an argument about the propriety of that, but I think this all is interconnected. Absolutely, Your Honor. And frankly, all three of Mr. Alvarado's in the terms are connected because the fact that they relied on Guzman Cordova's post affirmative evidence against Alvarado, again, to prove this one knowledge point, that's probably the second most important piece of evidence on which the government relied to prove Alvarado's knowledge. So all three of these arguments are all connected and all tied back to this one element that the government failed to prove in this case if you look at just the simple admitted evidence and if the jury had been properly instructed. Mr. Sir, can I clarify please what your argument is on the reliance on the co-defendant's statement in identifying your client? Are you making a brutal argument? It seemed to me you're not making a brutal argument, but you're making a hearsay argument. Could you please clarify what your argument on that piece of evidence is? Your Honor said it exactly right. It is a pure 801, 802 hearsay argument. And this court has cautioned litigants time and again that if there's an evidentiary problem, not to change or morph the issue into a constitutional one where a simple evidentiary mistake can be ruled on and decided on and be a basis for reversal. That's what we're doing here. This is a straightforward hearsay issue under 801 and 802. The exemptions did not apply to Alvarado. So the 801 exemptions are meant to allow in what is generally considered reliable testimony or reliable out-of-court statements against the person who made or adopted those statements. Guzman made the statement and Guzman adopted the statement, so it's perfectly admissible as to her. But Alvarado didn't make that statement, any of those statements. Alvarado didn't adopt any of those statements. They were pure hearsay as to him. Why wouldn't the court's jury instruction cure any potential prejudice to your client? Because that instruction was a generic instruction that came several days after the introduction of the evidence and came after the government actually argued to the jury the exact opposite. The government argued to the jury that it was permitted to use this evidence as affirmative evidence against Alvarado in proving that Alvarado was guilty. So you're now left with the jury that's being told by the government that it's allowed to use this evidence and specifically pointing to Guzman's statement. And then on the other hand, sometime later in the case, the district judge giving a generic instruction on the use of this evidence, I think at this point it's pretty impossible for us to decide that the jury ignored what the government was saying, adopted what the judge was saying in the abstract  I think that's too much to ask of a jury, Your Honor. And I see that my time has expired. All right, thank you very much. Ms. Klump. Thank you, Your Honor. Kendra Klump for the United States. I wanna start by addressing the harmless error argument that the court raised with respect to Alvarado Santiago's statement and the redactions thereof. Of course, the United States is arguing that this claim was forfeited given that Alvarado Santiago did not in any way raise this issue in a timely manner. At the time, well, in advance of trial, as well as during the trial when the statement and when the transcript were admitted, the defendant made no objection. Of course, as the court's aware, the witness was excused and then there was a lunch break. It was only at that point that the defendant made a vague assertion that he wanted to reserve his right to play the whole statement during his case in chief. And he didn't articulate any specifics or make any focused and specific requests that's demanded really under Rule 106. But even if you go past that issue and don't find that the claim was forfeited, there was not only no error as the redacted portions weren't necessary to complete the statement, but certainly not one that was harmless. Here, there was extensive knowledge of, or extensive evidence of Alvarado Santiago's knowledge, not just the statement. We had, for example, Salgado, the cooperator's testimony regarding the transactions and his interactions with Alvarado Santiago. The nature of those transactions itself demonstrates the defendant's knowledge of the illegality of these funds. For example, it was $10,000 at a time in cash that was plunked down at the defendant's store that then he broke up into small transactions and wired to Mexico in the names of unwitting third parties. In doing so, the defendant ignored all the intercambio protocol and procedures that he was required to follow. And the court is definitely correct that this blends into, therefore, the deliberate avoidance instruction issue. But it's clear from the record that there was ample evidence of the defendant's knowledge of the transactions. There were also ledgers showing, not just Salgado's testimony, there were ledgers that showed that Alvarado Santiago, known to the organization as Cartero, was receiving an additional $400 for every 10,000 that he washed. That's money on top of the intercambio fees that he would normally have received and did receive for every transaction, illegal or legal. There were also text messages recovered from cell phones between a Cartero and drug organization leaders where Cartero is saying, hey, some of these recipient names are blocked. I can't use them, I can't send money to them, give me new ones, so we don't have any problems. That's in the record, that has nothing to do with Salgado's testimony, for example. It simply corroborates Salgado's testimony and definitely provides evidence that this defendant knew that these transactions in which he was engaged were involved in legal money. So the evidence was far from razor thin on this issue. As to defense counsel or appellant's counsel's comment regarding the closing argument, that's regrettably that that comment was made, but there was no objection at that point during closing and far from being a vague limiting instruction that the district court gave. And I would note that the district court gave that instruction because the government proposed it prior to trial. It was a specific limiting instruction regarding the statement of a prior statement of a defendant not being used against the other defendant. It's hard to really make a more specific limiting instruction unless the district judge had said, defendant Alvarado Santiago's prior statement can't be used against Guzman Cordova, and then vice versa. The slump was, that instruction wasn't given when the testimony came in during trial, was it? No, it was not, Your Honor. And it wasn't requested. I don't believe there was an objection at the time and an instruction wasn't requested at that time, correct? The defense had objected to portions of, to some questioning as to Guzman Cordova's prior statements, but there was certainly no request for a limiting instruction. And that should not be on the government to request a limiting instruction in that case. Certainly sometimes defense counsel may not request a limiting instruction so as to avoid attention being drawn onto a question, for example. So no, there had not been a limiting instruction requested at the time the testimony came in, nor any more specific limiting instruction requested later. And in fact, of course, the Alvarado Santiago, as well as Guzman Cordova, agreed to those portions of the instructions. Although, of course, he objected with respect to the deliberate avoidance instruction. And it sounds like you would agree that Ms. Guzman Cordova's out-of-court statements to law enforcement were not admissible against Alvarado Santiago, correct? Yes, Your Honor, I would agree to that. I would also note that when in the course of the trial, it's not common that the government would, for example, offer exhibits such as such, or ask a question with respect to defendants, so-and-so only.  during the course of the trial. Ms. Conklin, I'd like to go back to the redaction of the Alvarado Santiago's statement to law enforcement. Yes. His knowledge of the source of this money. Was it the government that proposed the redaction? The redactions that are subject to debate, or did the court propose it? What was the chronology? I know there was a motion in limine, but I didn't have a record on that in terms of who proposed the particular redaction that is the subject of this debate. Sure, I'm glad that the court asked that question. So, leading up to the trial, it was not just these two defendants, but an additional two defendants, the leaders of the organization, who were scheduled for trial. Those two defendants didn't plead guilty until after the final pretrial. And so, leading up to it, the United States had filed a motion in limine pursuant to Bruton with proposed redactions for Alvarado Santiago's statement. In those redactions, it addressed issues related to Bruton. It also addressed issues that would clearly be prejudicial or improper at trial. And the United States is confident in its role, and it should have done that. And we did do it in this case. So, in addition to Bruton's statements in those proposed redactions, we redacted things like Alvarado Santiago's admission to having a firearm at the store or regarding his immigration status. After the two co-defendants, Lara Leone and Atoa Beltran fled out late in the game, the government adjusted its redactions. So, it no longer needs to worry about the Bruton issue. So, it proposed a longer version of the statement, and we proposed that and sent a copy to defense, both counsel for Alvarado Santiago and Guzman Cordova. There were no objections to that. And in fact, the district court's practice was to admit as many exhibits as possible at the beginning of each witness's testimony. So, there would be less interruptions during the testimony. And in fact, when you look at the record, Alvarado Santiago agreed to exhibit 900, I believe, which was his statement as redacted by the government and then 900T. So, the final redaction happened during the course of trial, not in the motion in limine? The final redaction occurred about a couple of weeks before trial when it was emailed as a proposed exhibit to the counsel and court. It didn't, so it was provided well in advance of trial. It wasn't any sort of on the fly redaction. If I could. Ms. Klump, you've given a very detailed argument with regard to the quantum of evidence, with regard to Mr. Alvarado Santiago, exclusive of the individual identifying him, et cetera. But I wanna go back to kind of where this started. With regard to him, this is a money laundering case. So, wouldn't it be relevant whether the defendant knew the money was illegal or was merely speculating as to its origins based upon certain stereotypes? So, the government, yes, the government had to prove that the defendant knew the money was coming from a specified unlawful activity. Why he held that belief or knowledge, the government did not need to prove why he held that belief or knowledge. And in fact, it just says in this case, even if the defendant's mens rea was based on an ugly set of inferences, for example, racial stereotypes, and not an ugly set of facts, which the United States would argue is also present here, the defendant still has the required mens rea. In the Velasco case before this court, this court cited to a Ninth Circuit, I believe, decision, and it stated that removing a defendant's explanation of the political and religious motivations for his action didn't change the meaning of the portions of his confession, where he said it didn't alter the fact that he admitted to the acts. So, here it's just the same thing, where the defendant was asked, where do you think the money's coming from? There was no, the question wasn't 100%, where do you know that the money's coming from? It was, where do you think the money's coming from, be honest, and he responded, drugs. Even assuming there was an error in the redaction, which the United States doesn't agree with, the omit, it couldn't be harmless because the omitted portion was in fact harm, would have been harmful. It simply gave another reason, albeit an ugly one, for why he believed the money was illegal. And also wanna touch upon, and I hope that addressed your question, I wanna touch upon counsel's comments about the direct examination of Alvarado Santiago. It was clear during the trial that Alvarado Santiago wanted to testify. He chose to do so before the court had ruled on the 106 issue. And it was clear that he was going to testify regardless of that 106 issue. Keep in mind, defense counsel have been given multiple opportunities and he was simply saying that he wanted to play the whole statement. So given he wasn't compelled, and then when he testified, he had ample opportunity to clarify any statement that he had made. He was asked, counsel cited, I think it was 1189, of the direct examination, and the question was, did you hide any information from them? No, and then the defendants started talking. What I told them, and then my co-counsel objected. The court said, yeah, he answered it. Next question. That's simple, that's a standard. Yes, you were asked a yes or no question. You can't give an unfettered narrative. What other questions did defense counsel ask? He asked, did anybody during those transactions identify the source of the money? What were you trying to explain to the special agents about what you knew about these people coming in to drop off the money? So there was no objection to those questions. Defense counsel was allowed to ask those questions, and those questions went directly to the issues we're talking about. The defendant having a chance to provide those explanations about where his beliefs were from, or what exactly he knew about the money, or didn't know about the money. So I think that shows that, one, there was no error, and that it certainly wasn't a harmless one. If I could, I would turn to perhaps some issues with Guzman-Cordova, since I have a limited time. Judge Brandon asked, what's the limiting principle for admitting evidence about threats? And the admitting principle is the case law that has already been set forth in this circuit. We know from Sawyer that any threat needs to be immediate. We know from McDowell that a potential future violence is an insufficient evidentiary foundation for a duress or coercion defense. And that's exactly what the defendant was trying to do when she wanted to admit evidence, which had a very undeveloped proffer on, about the alleged death of her father in 2018, months and months after she'd gotten arrested in Guatemala, I believe. So far, far away. It just, there's nothing to establish that the defendant knew that that death would occur. And even if you gave her the benefit of the doubt that she somehow knew that death would occur, again, going back to this court's cases and limiting principles, the threat of potential future violence is just not sufficient to establish coercion as to the third party. With respect to Pacman's alleged death, there's no evidence that defendant Guzman Cordova had any knowledge of that. That issue was raised because the government, pursuant to its obligations, turned over Salgado's proffer statements. And in one of those proffers, he speculated, he referenced Pacman's death, and he speculated as to the person who committed that act as well as, well, he speculated as the identity. I would note for the record, it's not George Noble. That person doesn't exist. That was a mistake by defense counsel. It was actually another person that Salgado guessed at when he was speculating as to that death. In contrast, Guzman Cordova was allowed to offer evidence of threats of violence or acts of violence to third parties that she knew about. So for example, there was discussion about the tooth pulling and defense counsel asked Salgado about the tooth pulling incident on cross-examination. And that evidence was admitted by the district court, partially on the premise that Guzman Cordova had knowledge, had learned of through others. She wasn't there, but she learned through others of that tooth pulling incident. In fact, that was never tied up during Guzman Cordova's direct examination. So that belief was never actually established on the record, but that's what was proffered. And that's, I would submit the primary reason why that evidence came in. And it just also goes to show that this is far from a case where Guzman Cordova was precluded from presenting the heart of her defense. She had ample opportunity and she did so. She offered evidence of threats to third parties when she could show that she knew about them or that they occurred at an appropriate timeline in case. And she testified extensively. I'll be a testimony that was refuted by the record, the rest of the record, but she testified about threats of violence that were committed to her. So I think that there certainly wasn't any error in or abuse of discretion, certainly in excluding the evidence of those alleged deaths, much less one that would be plain error or certainly not a harmless error. The evidence, just as with the extensive evidence of Alvarado Santiago's knowledge, both direct and indirect or circumstantial and direct of the source of the funds, there was ample evidence to refute Guzman Cordova's claim of duress. We saw text messages between Guzman Cordova and her boyfriend, Salvato, with heart emoticons that occurred late in the conspiracy. We saw text messages between her and the organization's leader about conquering the world. The photos from Guzman Cordova's cell phone were, it was apparent that they had an effect on the jury because when the defendant was shown them on cross-examination, she admitted there were photos of her and her friends, her and her children. And then it was later established that those pictures were taken throughout the time period when she alleged to be under this coercive effect. So there was ample evidence to refute those claims, especially in a case like a conspiracy where it's an ongoing crime. And we know that those types of cases are more difficult to establish a duress defense. With regards to the forfeiture issue that was discussed briefly, there was more than an ample nexus and it's clear that the defendant's substantial rights were not affected. The guns and- So do you agree, Ms. Klump, that the district court violated rule 32.2 by not presenting the issue to the jury? Yes, and I would say that, again, there was no objection as the courts noted. And that, therefore, this case, just like the Fisher and Cherry cases, we need to look at whether there was a substantial effect on the defendant's rights. How do you respond to counsel's argument that there was no advanced notice about this? Is the indictment sufficient to give the advanced notice? Yes, the indictment included a forfeiture allegation. So that was, it constituted advanced notice. In addition, the defendant also was specifically complaining about the failure of the court to issue a preliminary order of forfeiture and the defendant, for example, in the pre-sentence investigation report had additional notice of the forfeiture at that point. Yes, I would submit that the indictments, allegations of forfeiture put the defendant on notice for them to be requested. And the nexus here is undeniable between the property. The guns were being inventoried the same day as the defendant's arrest by the leaders of the organization. Drugs were being cut up for resale and distribution in the house while the defendant was present right before her arrest. The ledgers show that the organization was making money hand over fist, money that the defendant shared in, and the money at question, the $9,700 in cash was found in the West bedroom of the house, not the defendant's bedroom. And it was found next to Tupperwares filled with heroin and cocaine, a gun, and scales. So this isn't a case where there's $700 next to the painting pay sub found in the defendant's purse. This is far from that. This is, the nexus is clear that this was drug money. Being- I don't think you'll have to wrap up. If you have a conclusion to forward to. Yes, thank you, Your Honor. So I would apologize about going over time and I would conclude that the district court carefully examined the facts before it, the record introduced at trial, and it gave appropriate jury instructions and appropriately included or diluted evidence. Thank you. Thank you very much. Mr. Hilleth, your time had expired, but you may have an additional minute if you have some brief thoughts in rebuttal. Yes, Your Honor, I appreciate it. Thank you. So the indictment's not enough to give notice. The government never argued that it was. The government's indictment alleged that he was subject to forfeiture. It says nothing to say that my client is entitled to a jury determination on that. So the government never made that argument and it's not able to make that argument now. As for the proof about what my client knew from Mr. Salgado as to the death of the drug dealer, Salgado was my client's boyfriend, so she would know lots of things from him. And the government, like the indictment issue I just talked about, didn't argue that Guzman Corso but didn't know who killed Pac-Man. So while those are fine points to inquire about on the appeal, we can look to what the evidence is. The government never contested that my client knew this. And of course, I worry that we're steering to a 2255 for trial counsel by not making an offer of proof that was easily made to connect these dots here. So with that, I ask the court to vacate and remand. Thank you. Thank you. Thank you, Your Honor. Two brief points. One, had the district judge gotten this right and required the government to complete its proof on the post-arrest statement during its case in chief by having Special Agent Schmidt just get back on the stand, it's not at all clear that Alvarado would have taken the stand. And this court and numerous courts around the country have said that you can't require a defendant to get on the stand to correct an error, a clear error by the government in its case in chief and its proof. It's tantamount to a Fifth Amendment violation. And so you can't rely on him taking the stand to correct this issue. And again, I urge this court to look at pages 1189 to 1191 of the transcript and compare those to the ruling that was pending and the ruling that the judge ultimately made refusing to allow the three grounds, Mr. Alvarado to get in the complete statement. He was not allowed to get in that statement either during his testimony. So I ask this court to reverse the judgment of the district court. All right, thanks very much. And our thanks to all counsel, the case is taken under advisement.